UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KELLIE ROBINSON, | ) | 1:12CV1913 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | MAG. JUDGE KENNETH S. McHARGH |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMIN., | ) | |
| | ) | |
| | ) | |
| Defendant | ) | MEMORANDUM |
| | ) | AND ORDER |

McHARGH, MAG. JUDGE

The issue before the court is whether the final decision of the Commissioner
of Social Security ("the Commissioner") denying Plaintiff Kellie Robinson's
applications for a Period of Disability and Disability Insurance benefits under Title
II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, and Supplemental
Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C § 1381
et seq., is supported by substantial evidence and, therefore, conclusive.

As the Commissioner points out, Robinson "has challenged only the ALJ's
determination as to the severity of her carpal tunnel syndrome and the ALJ's
reliance, at least in part, on the medical opinion of Dr. Onamusi." (Doc. 15, at 3.)

I.  PROCEDURAL HISTORY

On June 8, 2011, Plaintiff Kellie Robinson ("Robinson") applied for Supplemental Security Income benefits.  (Doc. 11, Tr., at 33, 155.)  Robinson's application was denied initially and upon reconsideration.  (Tr., at 33, 65, 101.)  On December 22, 2011, Robinson filed a written request for a hearing before an administrative law judge.  (Tr., at 104.)

An Administrative Law Judge ("the ALJ") convened a hearing on May 8, 2012, in Cleveland to hear Robinson's case.  (Tr., at 33, 49-64.)  Robinson was represented by counsel at the hearing.  (Tr., at 33, 51.)  Nancy J. Borgeson ("Borgeson"), a vocational expert, attended the hearing and provided testimony. (Tr., at 49, 60-63.)

On May 23, 2012, the ALJ issued his decision applying the standard five-step sequential analysis[1] to determine whether Robinson was disabled.  (Tr., at 34-35.)

_____

[1] Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability."  See 20 C.F.R. §§ 404.1520(a), 416.920(a); Heston v. Commissioner of Social Security, 245 F.3d 528, 534 (6th Cir. 2001).  The Sixth Circuit has outlined the five steps as follows:

> First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability.  20 C.F.R. § 404.1520(a)(4)(i). Second, the claimant must show that he suffers from a severe medically determinable physical or mental impairment.  Id. § 404.1520(a)(4)(ii).  Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, he is deemed disabled.  Id. § 404.1520(a)(4)(iii).  Fourth, the ALJ determines whether, based on the claimant's residual functional capacity, the claimant can perform his

Based on his review, the ALJ concluded Robinson was not disabled.  (Tr., at 33, 41.)

Following the issuance of this ruling, Robinson sought review of the ALJ's decision

from the Appeals Council.  (Tr., at 26.)  However, the council denied Robinson's

request for review, as well as her request to reopen, thus rendering the ALJ's

decision the final decision of the Commissioner.  (Tr., at 1, 26.)  Robinson now seeks

judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 1383(c).

      Robinson briefs two issues:

> 1.  Whether the ALJ erred when he relied upon vocational expert
> testimony premised on an RFC [residual functional capacity] which
> excluded important manipulative and reaching limitations; the error
> prevents the ALJ from recognizing plaintiff should "grid out."

> 2.  Whether the ALJ erred in relying on Dr. Onamusi's opinions which
> were used for the RFC, when the [doctor]'s limitations do not align
> with the RFC, and when the ALJ actually rejected Dr. Onamusi's
> opinions.

(Doc. 14, at 1.)

---

> past relevant work, in which case the claimant is not disabled.  Id. §
> 404.1520(a)(4)(iv).  Fifth, the ALJ determines whether, based on the
> claimant's residual functional capacity, as well as his age, education,
> and work experience, the claimant can make an adjustment to other
> work, in which case the claimant is not disabled.  Id. §
> 404.1520(a)(4)(v).

> The claimant bears the burden of proof during the first four steps, but
> the burden shifts to the Commissioner at step five. Walters v. Comm'r
> of Soc. Sec., 127 F.3d 525, 529 (6th Cir.1997).

Wilson  v. Commissioner of Social Security, 378 F.3d 541, 548 (6th Cir. 2004).

## II.  PERSONAL BACKGROUND INFORMATION

Robinson was born on December 27, 1961, and was 49 years old as of her alleged disability onset date.  (Tr., at 155.)  Robinson's highest level of education was high-school equivalent (GED).  (Tr., at 52, 262.)  She has no past relevant work.  (Tr., at 40, 60.)

## III.  MEDICAL EVIDENCE[2]

Robinson was seen by Brent Bickel, M.D., for wrist and shoulder pain, on January 14, 2008.  She was diagnosed with some numbness and tingling consistent with carpal tunnel syndrome.  Although she tested positive for carpal tunnel syndrome in two of three tests administered, Dr. Bickel noted she had no atrophy of her palm and thumb muscles.  Robinson was given an injection of anti-inflammatory medication for her shoulder pain, and an oral anti-inflammatory and a wrist splint for her symptoms.  (Tr., at 393.)

Robinson followed up with Eric Friess, M.D., her primary care physician, on March 3, 2008.  Dr. Friess found that Robinson was "doing well with her shoulder concerns."  (Tr., at 388.)  On a subsequent follow-up visit to Dr. Friess on May 20, 2008, Robinson continued to complain of joint and shoulder pain, "but is not yet ready for surgery."  (Tr., at 385-386.)  At a subsequent visit on September 9, 2008,

---

[2] The following is merely a summary of the medical evidence relevant to the undersigned's decision.  It is not intended to fully reflect all of the evidence the undersigned took into consideration.  Given the contested issues in this case, the focus is on evidence concerning carpal tunnel syndrome.

Dr. Friess did not record any complaints about carpal tunnel syndrome, and noted that her shoulder was "doing better with improved ROM." (Tr., at 378.)

On her Oct. 22, 2008, visit with Dr. Friess, Robinson reported she had shoulder pain, which possibly occurred when she helped a friend lift furniture during a move. Again, no mention of carpal tunnel syndrome. (Tr., at 374.)

At a March 5, 2009, routine follow-up visit with Dr. Friess, Robinson complained of left elbow pains that caused numbness in her left hand. (Tr., at 363.) Robinson presented to Robert Coale, M.D., on April 27, 2009, with left wrist pain with associated numbness to all fingers, and related left elbow and forearm pain. Robinson reported to Dr. Coale that the numbness was present nearly every day, and was worse with "pinching type activities." (Tr., at 358.)

Dr. Stephanie Casey diagnosed Robinson with carpal tunnel syndrome on June 8, 2009, noting that Robinson had an EMG [electromyography] which showed mononeuropathy of the bilateral median nerves and borderline left ulnar nerve entrapment. Robinson continued to report left wrist pain, but also reported that she was not wearing her splints. Robinson complained of decreased grip strength and numbness in all five fingers. Robinson was given a steroid injection in her left wrist. (Tr., at 354.)

At a September 14, 2009, follow-up appointment with Francisco Rubio, M.D., Robinson reported that the June injection improved her carpal tunnel pain, as well as the numbness and tingling. Robinson did say that she had not been compliant

with the use of her night splint, which Dr. Rubio encouraged her to use to continue to experience relief.  (Tr., at 338.)

Robinson's December 22, 2009, health screening for the state Department of Corrections in connection with her incarceration indicated that she had current medical conditions of hypertension, hypothyroidism, and Hepatitis C.  Robinson did not report any disabilities or limitations, other than requiring a "low bunk order." (Tr., at 468; see also 469-474.)

Shortly after her release from state custody, on June 27, 2011, Robinson visited Nurse Practitioner Jean Knudsen to have medications updated for her conditions of hypertension, hypothyroidism, and Hepatitis C.  Robinson did not report any symptoms of carpal tunnel syndrome at that appointment.  (Tr., at 477-478.)

On July 26, 2011, Robinson had a psychological evaluation conducted by Matthew Paris, Psy.D., relating to her claim for mental disability benefits.  (Tr., at 273-281.)  In the course of that evaluation, she reported that her medical problems included hepatitis C, high blood pressure, and chronic back pain.  (Tr., at 275.)  Dr. Paris determined that Robinson met the criteria for PTSD and dysthymic disorder, with a significant history substance abuse.  (Tr., at 279.)

Robinson returned to Dr. Friess for a routine follow-up after her incarceration on September 2, 2011.  Robinson was concerned that her thyroid dosing from prison was not accurate, and she asked about alternative medications

for pain, expressing a willingness to see pain management staff.  (Tr., at 335.)  She complained of joint pain in her lower leg, however, not carpal tunnel.  (Tr., at 336.)

On September 22, 2011, Robinson had a physical consultative examination with Babtunde Onamusi, M.D.  (Tr., at 283-290.)  Dr. Onamusi related that Robinson "presented with complaints of pain in the lower back, right shoulder and history of hepatitis C and hypothyroidism."  (Tr., at 288.)  Robinson reported "constant pain in the lower back," which she described as severe.  Robinson also reported radiation of pain down her legs, "with numbness, tingling and weakness in both legs."  (Tr., at 288.)  Muscle power and tone were found to be normal in all muscle groups.  (Tr., at 290.)  Dr. Onamusi noted that Robinson "has no trouble using the hands for gross or fine motor tasks," and was "able to use the hands for fine coordination and manipulative tasks."  (Tr., at 289-290.)  Dr. Onamusi observed:  "She had very limited range of motion in the back (effort felt to be suboptimal). She moaned and groaned and grimaced with examination..."  (Tr., at 290.)

Dr. Onamusi's assessment was "chronic lower back and left shoulder pain, probably degenerative in nature," and hepatitis C.  Dr. Onamusi opined that Robinson "is currently capable of engaging in sedentary to light physical demand level activities."  (Tr., at 290.)

Robinson returned to Dr. Friess on December 2, 2011, complaining of worsening left wrist pains.  Dr. Friess noted her past carpal tunnel syndrome, and that she had been doing better, but cooking and walking the dog caused issues.  She

7

reported pains into the palm and numbness with twisting action.  (Tr., at 439-440.)
Robinson was given a wrist brace, and received pain injections.  (Tr., at 440, 443.)

On a referral from Dr. Friess, Robinson visited James L. Hill, M.D., and
David Ryan, M.D., on December 14, 2011.  Robinson presented her "chief complaint
of pain in the left shoulder and lower back for 1 years.  The pain is described as
constant, sharp, burning and is relieved by percocet. . . . The worst is the back pain.
There is no radiation to the legs."  (Tr., at 426.)  Dr. Hill's assessment was lumbar
spondylosis.  (Tr., at 428.)  Dr. Ryan prescribed physical therapy and medication.
Id.

On December 15, 2011, Gerald Klyop, M.D., completed the medical portion of
the disability determination.  (Tr., at 87-89.)  Dr. Klyop found that Robinson had
manipulative limitations, noting that reaching was limited both left in front and
laterally, and left overhead.  However, he determined that handling (gross
manipulation), fingering (fine manipulation), and feeling were unlimited.  (Tr., at
88.)

Robinson appeared at a January 10, 2012, follow-up appointment with Dr.
Friess, who advised her to continue to use the brace for her carpal tunnel syndrome,
and to continue to keep her appointments with Ortho Hand clinic and the
Comprehensive Pain management course.  She reported that she had been sober for
many months.  (Tr., at 415-416.)  At her March 14, 2012, appointment with Dr.
Friess, however, Robinson reported that "she had relapse with etoh [alcohol] and

8

placed herself in detox/rehab program for two mos." At that March visit, she said she had been sober for "many weeks," and was residing in a shelter. (Tr., at 605.)

Robinson had an appointment with Michael W. Keith, M.D., of the Ortho Hand clinic on April 4, 2012, where she complained of left hand pain, numbness and tingling. (Tr., at 606.) The physical exam by Dr. Keith confirmed bilateral carpal tunnel syndrome. Dr. Keith was concerned about nutritional nerve disorders, so he started her on multivitamins, and gave her wrist braces for protection. Dr. Keith stated that Robinson "probably needs a carpal tunnel release." (Tr., at 607.)

The next day, Robinson had an appointment with Brendan Astley, M.D., and David Ryan, M.D., where she received medications for her continuing lumbar pain, along with reminders to protect her back and improve her strength.

## IV.  TESTIMONY OF VOCATIONAL EXPERT

The vocational expert, Borgeson, testified that Robinson had no substantial past relevant work. (Tr., at 60.)

The ALJ posed a hypothetical question concerning a 50-year-old woman with a high school GED, who lift or carry occasionally 20 pounds, or frequently 10 pounds; can stand, walk or sit six out of eight hours; "no limit on foot pedal," but only occasionally push or pull; can occasionally sue a ramp or stairs but never a ladder, a rope, or a scaffold; can constantly balance; occasionally stoop or crouch, but never kneel or crawl. "This person can occasionally reach overhead, more frequently parallel to the floor. This person can frequently handle, finger, and feel

9

– frequently as opposed to constant – no visual limitations, no communications deficits."  The person should avoid unprotected heights.  The person should do no complex tasks, but can do simple, routine tasks, which are low stress, and which do not involve high productions quotas, piece-rate work, arbitration, negotiation or confrontation.  (Tr., at 60-61.)

In response to the hypothetical, Borgeson answered that light, unskilled work would be appropriate, and gave examples of a Cashier II (simple cashiering), an electronics worker, or a cleaner, housekeeping, all of which jobs exist in northeast Ohio and nationally in some numbers.  (Tr., at 61-62.)

Counsel for Robinson changed the hypothetical to an "individual that can handle, finger, feel on the dominant – with the dominant left hand only occasionally and frequently with the right hand, could the individual perform the jobs that you've identified?"  In response to that modified hypothetical, Borgeson responded:

> No.  They would require, all of them, more than occasional handling bilaterally really.  In fact, most of the light, unskilled jobs would require at least frequent handling bilaterally.

(Tr., at 62.)  Borgeson testified that even unskilled, sedentary activity requires more than occasional handling bilaterally.  (Tr., at 63.)

## V.  ALJ's DECISION

The ALJ made the following findings of fact and conclusions of law.  At step one of the five-step sequential analysis, the ALJ found Robinson had not engaged in substantial gainful activity since June 8, 2011.  (Tr., at 35.)  At step two, the ALJ

10

ruled Robinson suffered from the following severe impairments:  "degenerative disc disease, anxiety disorder, depressive disorder, bilateral carpel tunnel syndrome and alcohol abuse disorder."  (Tr., at 35.)  But, at the next step, the ALJ determined that none of these impairments, individually or combined, met or equaled one of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr., at 36.)  The ALJ determined that:

> Ms. Robinson retains the ability to perform fine and gross manipulations with her upper extremities, as shown by testimony that she cooks.  Her carpal tunnel syndrome does not meet Listing 1.02 (major dysfunction of a joint).
>
> There is no evidence, by x-ray or positive straight leg raising, of nerve root compression, stenosis or arachnoiditis and thus Ms. Robinson's back pain does net meet Listing 1.04 (disorders of the spine).
>
> The severity of Ms. Robinson's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of Listings 12.04, 12.06 and 12.09.  In making this finding, I have considered whether the "paragraph B" criteria are satisfied.
>
> * * * * *
>
> As Ms. Robinson's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.
>
> I have also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of "paragraph C" criteria.  Ms. Robinson is capable of daily living activities on her own and there is no evidence in the most recent mental status examinations that she is likely to decompensate.

(Tr., at 36.)

11

The ALJ next assessed Robinson' residual functional capacity ("RFC").  He concluded that Robinson retained the ability to perform light work as defined in 20 C.F.R. § 416.967(b), with the following additional limitations:  Robinson can lift twenty pounds occasionally and ten pounds frequently; she can sit, stand and walk for six hours out of an eight hour workday; she can only occasionally push or pull; she can  occasionally climb stairs or ramps, but she can never climb ladders, ropes, or scaffolds; she can constantly balance, occasionally stoop or crouch, and can never kneel or crawl; she can occasionally reach overhead, and frequently reach parallel to the floor; she can frequently handle, finger and feel; she should avoid unprotected heights; she can perform no complex tasks, but can perform simple and routine tasks; she can only perform low stress work with no high production quotas or piece rate work; and she can do no work involving arbitration, confrontation or negotiation.  (Tr., at 37.)

The ALJ stated that he considered all of Robinson's symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence, including opinion evidence.  (Tr., at 37.)  The ALJ conducted a two-step analysis:  First, he found that Robinson's medically determinable impairments could reasonably be expected to cause the alleged symptoms; "however, her statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  Second, the

12

ALJ evaluated the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit  Robinson's functioning.  (Tr., at 37-40.)

The ALJ stated that Robinson initially applied based on her depression.  (Tr., at 38; see also tr., at 101, and 190, listing conditions that limit ability to work as Hepatitis C, Hypothyroid, High blood pressure, and Depression.)  The ALJ noted that, on reconsideration, Robinson alleged shoulder and back pain, as well as carpal tunnel syndrome.  (Tr. at 38; see also tr., at 226, listing new conditions since 6/8/11 Disability Report.)

The ALJ pointed out that Robinson received no care for her alleged back pain while she was incarcerated [December 2009 to June 2011] "and a release discharge note does not mention any back pain."  The ALJ states that she first mentioned the problem during a psychological examination by Dr. Paris in July 2011.  (Tr. at 38; see also tr., at 275.)

The ALJ gave "great weight" to the opinion evidence of Dr. Klyop:  "This opinion formed the basis of this finding and is consistent with the findings of Dr. Onamusi and Dr. Friess."  (Tr., at 39.)  Great weight was also given to the opinion of Dr. Goldsmith, the reviewing psychologist, which was consistent with the findings and opinion of Dr. Paris and the treatment notes from Dr. Turkson.  (Tr., at 39; see generally tr., at 89-90.)

As to Robinson's carpal tunnel syndrome, the ALJ noted that her CTS "would limit her ability to lift overhead throughout the adjudicated period, but her good response to treatment in the past, along with the long gap in treatment prior to

13

December of 2011, prevent greater limitations with regard to her handling, fingering and feeling." (Tr., at 40.)  The ALJ pointed out that Dr. Onamusi reported no difficulty with handling, fingering and feeling in September 2011, and found that her current numbness had not lasted the requisite twelve months to result in a limitation to her RFC.  (Tr., at 40.)

The ALJ found that additional limitations have impeded Robinson's ability to perform all or substantially all of the requirements of the full range of light work. (Tr., at 40.)  However, based on the testimony of the vocational expert, the ALJ concluded that, considering her age, education, work experience and residual functional capacity, Robinson is capable of making a successful adjustment to work that exists in significant numbers in the economy, and a finding of "not disabled" was appropriate under the rules.  (Tr., at 41.)  The ALJ found that Robinson has not been under a disability since June 8, 2011, the date she filed her application.

## VI.  DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when he establishes disability within the meaning of the Social Security Act.  See 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when he cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  See 20 C.F.R. §§ 404.1505, 416.905.

14

## VII.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether the ALJ applied the correct legal standards, and whether the findings of the ALJ are supported by substantial evidence.  Blakley v. Comm'r of Social Security, 581 F.3d 399, 405 (6th Cir. 2009); Richardson v. Perales, 402 U.S. 389, 401 (1971).  "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  See Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, that determination must be affirmed.  Id.

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this court would resolve the issues of fact in dispute differently, or substantial evidence also supports the opposite conclusion.  See Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986); Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).  This court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility.  See Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).  However, the court may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision.  See Walker v. Sec'y of Health & Human Servs., 884 F.2d 241, 245 (6th Cir. 1989).

## VIII.  ANALYSIS

Robinson challenges the ALJ's decision on two grounds:  1) the ALJ erred when he relied upon vocational expert testimony premised on an RFC which excluded important manipulative and reaching limitations, and 2) the ALJ erred in relying on Dr. Onamusi's opinions for the RFC, when the doctor's limitations do not align with the RFC, and the ALJ actually rejected Dr. Onamusi's opinions.  (Doc. 14.)

### A.  Manipulative Limitations

Robinson argues that the ALJ's finding is not supported by substantial evidence "because the ALJ's hypothetical question to the vocational expert did not accurately depict Ms. Robinson's manipulative and reaching limitations."  (Doc. 14, at 8.)  Robinson argues that substantial evidence in the record demonstrates that Robinson's carpal tunnel syndrome would limit her manipulative functioning beyond the "frequent" determination adopted by the ALJ.  (Doc. 14, at 9-10.)

Robinson recounts evidence that she reported wrist pain, numbness and tingling to her doctors on numerous occasions over a period of years.  (Doc. 14, at 10-11, citing tr., at 354, 393, 358, 338, 440, 607.)  Robinson stresses that Dr. Keith, at an April 2012 exam, confirmed carpal tunnel syndrome, and opined that she probably needs a carpal tunnel release.  (Doc. 14, at 11, citing tr., at 607.)  Robinson contends that these records show she "has a condition that has been unsuccessfully treated in the past, and has now progressed [to] the point of requiring surgery."  (Doc. 14, at 11.)

16

The Commissioner points out that hypothetical questions need only incorporate those limitations which the ALJ has accepted as credible.  (Doc. 15, at 13, citing Parks v. Social Sec. Admin., No. 09–6437, 2011 WL 867214, at *9 (6th Cir. March 15, 2011).)  The Commissioner argues that Robinson's primary care physician, Dr. Friess, saw her on numerous occasions without recording anything in his notes about Robinson's alleged carpal tunnel symptoms.  (Doc. 15, at 13, citing tr., at 335-337, 373-376, 377-379.)  The Commissioner concedes that Robinson complained of elbow pain and left hand numbness in 2009, which led to a referral to Dr. Keith, and that she again complained of left wrist pain during a December 2009 visit.  (Doc. 15, at 13, citing tr., at 363-364, 439.)  The Commissioner states that Dr. Friess simply continued her course of medications and pain injections.  Id.

The Commissioner points to the same April 2012 visit to Dr. Keith which is referenced by Robinson, and notes that Dr. Keith found no significant soft tissue or bony abnormalities in her left hand, and that her carpal tunnel symptoms were likely the result of nutritional deficiencies, and prescribed multivitamins and continued use of a wrist brace.  (Doc. 15, at 13, citing tr., at 607, 609.)

There is no question that Dr. Keith diagnosed bilateral carpal tunnel syndrome at the April 2012 visit.  Dr. Keith expressed concern about nutritional nerve disorders that would need to be treated, and started her on multivitamins, along with wrist braces.  Yet, at the same time, he stated:  "She probably needs a

carpal tunnel release[3]."  Dr. Keith intended to obtain an EMG to confirm that Robinson did not have peripheral neuropathy "as this would affect her consent and prognosis."  (Tr., at 607.)  Dr. Keith made no specific finding on the record, however, as to any manipulative or other limitations which might arise from her condition.

On the other hand, as the Commissioner points out, Dr. Onamusi found that Robinson was able to use her hands for fine coordination and manipulative tasks: ". . . she was able to tie knots, do buttons, do shoelaces, pick up coins, hold pens, turn door handles, pull zippers and do fine fingering movements."  (Tr., at 290.)  At that consultative exam of September 22, 2011, Dr. Onamusi expressed some hint that Robinson may have been exaggerating her symptoms.  In any event, his opinion was that Robinson was capable of engaging in sedentary to light physical demand activities.  (Tr., at 290.)

Following Robinson's application for benefits, Dr. Klyop reviewed her medical records on December 15, 2011.  (Tr., at 87-89.)  Dr. Klyop found that Robinson was "unlimited" in handling (gross manipulation), fingering (fine manipulation), and feeling.  (Tr., at 88.)  As the Commissioner points out, apparently nothing in Robinson's medical records indicated to Dr. Klyop that Robinson's CTS caused a loss of ability to use her hands.  See doc. 15, at 14.  Dr. Klyop did find that Robinson had

---

[3] Carpal tunnel release is outpatient surgery to treat carpal tunnel syndrome. Carpal tunnel release decreases pain, nerve tingling, and numbness, and restores muscle strength.  See generally http://www.nlm.nih.gov/medlineplus/ency/article/002976.htm.

"limited" manipulative limitations, though, insofar as reaching, both "Left in front and/or laterally," and "left overhead." (Tr., at 88.)  As mentioned earlier, the ALJ gave "great weight" to Dr. Klyop's opinion evidence, which the ALJ stated "formed the basis of this finding," and was consistent with the findings of Dr. Onamusi and Dr. Friess.  (Tr., at 39.)

In addition, the Commissioner states that Dr. Casey did not note any functional limitations arising from Robinson's condition.  Dr. Rubio noted the efficacy of a steroid injection administered by Dr. Casey for pain, and recommended that Robinson continue using a splint.  Dr. Rubio did not note any functional limitations arising from Robinson's condition.  (Doc. 15, at 15, citing tr., at 354, 338.)

Robinson contends that the evidence "demonstrates that Ms. Robinson's carpal tunnel syndrome would limit her manipulative function" more severely than the ALJ determined.  (Doc. 14, at 10.)  However, she points to no evidence in the record supporting this argument.  Of course, Robinson as claimant bears the burden of proof at this stage.  Wilson, 378 F.3d at 548; Walters, 127 F.3d at 529.  Robinson refers to ample evidence in the record, mostly undisputed, of her carpal tunnel syndrome, and related pain and discomfort, but references no medical evidence which demonstrates specific manipulative  limitations found to be caused by her condition.  See generally doc. 14, at 10-11; doc. 15, at 14-15; see also Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir. 1997) (claimant's

statements concerning pain or other symptoms not sufficient alone to establish she is disabled, citing 20 C.F.R. § 404.1529(a)).

Although Robinson characterizes the ALJ's analysis of her carpal tunnel syndrome as "speculative" and inconsistent with the medical records (doc. 14, at 11), the court disagrees.  To presume manipulative limitations arising from the existence of her condition, without medical findings in support, would be speculative.

Robinson also contests the ALJ's finding that her "current numbness has not lasted for the requisite 12 months to result in a limitation in her residual functional capacity." (Doc. 14, at 10, quoting tr., at 40.)  Robinson sees a contradiction between the ALJ determining that, overall, her carpal tunnel syndrome is a severe impairment[4], yet finding that the specific symptom of numbness, which arises out of the CTS, was not severe, under the regulations, on the basis of the duration of that symptom.  She argues that the "separation of the condition and the symptom naturally resulting from the condition is inconsistent." (Doc. 14, at 12.)  The court would note that not all conditions necessarily manifest all of their symptoms constantly.  In this case, the evidence is that Robinson was diagnosed with carpal tunnel syndrome, yet did not always complain of, or display, numbness over the course of time following that diagnosis.

---

[4] Of course, the ALJ also determined that her carpal tunnel syndrome does not the sufficient severity of a listed impairment.  (Tr., at 36.)

Robinson stresses that the RFC limits her to "frequent handling, fingering, and feeling." (Doc. 14, at 12.)  This limitation merely indicates that Robinson could not engage in these activities constantly.  In fact, Dr. Klyop's finding, to which the ALJ accorded "great weight," was that Robinson was "unlimited" in handling, fingering, and feeling.  (Tr., at 88.)

Robinson argues that, had the ALJ adopted the modified hypothetical put forward by counsel at the hearing – an individual that can handle, finger, feel with the dominant left hand only occasionally but frequently with the right hand – and had Robinson been found to be limited to sedentary work, the Medical Vocational Guidelines (20 C.F.R. Part 404, Subpt. P, Appx. 2) would dictate that Robinson would be found to be disabled as of her fiftieth birthday.  (Doc. 14, at 14.)  Yet Robinson points to no medical evidence in the record which would support such a hypothetical.  There is no indication of any medical opinion which determined that Robinson was limited to handle, finger, and feel with her left hand only occasionally.  A hypothetical question to the vocational expert must accurately portray the claimant's physical limitations.  Pasco v. Commissioner of Social Sec., No. 03-4358, 2005 WL 1506343, at *14 (6th Cir. June 23, 2005); Varley v. Secretary of HHS, 820 F.2d 777, 779 (6th Cir. 1987) (citing cases).

The court finds that the ALJ's hypothetical question properly and accurately portrayed Robinson's individual manipulative limitations.

### B.  Reaching Limitations

Robinson also argues that the hypothetical failed to accurately account for her "left upper extremity" (meaning, presumably, her left arm) reaching limitations. (Doc. 14, at 13-14.)  The hypothetical posited a person who can occasionally reach overhead, more frequently parallel to the floor.  (Tr., at 37.)  Robinson points out there is a mismatch between Dr. Klyop's findings and this hypothetical.  (Doc. 14, at 13.)  Dr. Klyop found that reaching was limited both left in front and laterally, and left overhead.  (Tr., at 88.)  Robinson contends that the ALJ gave no explanation for this discrepancy, thus this aspect of the RFC is not supported by substantial evidence.  (Doc. 14, at 14.)

The Commissioner points out that the ALJ did not rely solely on Dr. Klyop's opinion, although it formed the base for the RFC.  The ALJ also considered the findings of Dr. Onamusi and Dr. Friess.  (Tr., at 39.)  Dr. Onamusi examined Robinson and scored her 5/5 during muscle testing for her right and left shoulder abductors, shoulder external rotators, and shoulder internal rotators, which indicated she could raise her shoulders against maximal resistance.  (Tr., at 284.)  He also noted restricted motion in her left shoulder, with tenderness, although there was no weakness in the musculature.  He commented that, during range of motion testing, "effort felt to be suboptimal."  (Tr., at 290.)

The Commissioner points out there were similar indications of muscle strength and flexibility in earlier exams as well.  (Doc. 15, at 15.)  At the January 2008 exam with Dr. Bickel, Robinson reported left shoulder pain.  He found she had

22

"5/5 strength on flexion and abduction of the plane of the scapula as well as internal rotation, external rotation." (Tr., at 393.)  Robinson visited Dr. Casey complaining of left wrist pain, but had "good strength 5/5 bilaterally."

The court finds that the ALJ's hypothetical question accurately portrayed Robinson's individual reaching limitations.  In summary, the ALJ stated his RFC assessment was supported by the opinions of the state agency, Dr. Paris and Dr. Onamusi, the notes from Dr. Friess and Dr. Turkson, and Robinson's reported abilities.  (Tr., at 40.)  The court finds that the ALJ's RFC is based on substantial evidence in the record, as outlined in his findings and supported by the medical evidence.

### C.  Dr. Onamusi's Opinions

Robinson claims that the ALJ erred in relying on Dr. Onamusi's opinions because the ALJ relied on those opinions in a contradictory and confusing manner. (Doc. 14, at 15-16.)  Robinson notes that Dr. Onamusi found that Robinson could perform sedentary to light physical activities.  (Doc. 14, at 15.)  Robinson is confused that the ALJ held that his RFC assessment "is supported by the opinions of Dr. Onamusi . . . yet this opinion does not make clear whether Ms. Robinson could perform sedentary or light work, or the degree of light work." (Doc. 14, at 15.)

As the Commissioner points out (doc. 15, at 18), the regulations provide that a claimant's "residual functional capacity is the most [she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a) (emphasis added).  The Commissioner argues

that there is no inconsistency between Dr. Onamusi's finding, stating a range of work Robinson could perform, and the ALJ's adoption of the highest exertional level within that spectrum.  (Doc. 15, at 18.)  The court agrees.

The Commissioner also points out that Dr. Onamusi acknowledged that Robinson may have been exaggerating her limitations because she gave a suboptimal effort during her back exam.  (Doc. 15, at 19, citing tr., at 390.)  The Commissioner references, as well, other evidence in the record tending to indicate that Robinson did not have debilitating back limitations, such as numerous treatment notes by her primary care provider, Dr. Friess, and others.  (Doc. 15, at 19, citing tr., at 336, 346, 352, 364, 378, 389, 440.)

The ALJ has the responsibility for reviewing all the evidence in making his determinations.  20 C.F.R. § 416.927(e)(2).  The ALJ evaluates every medical opinion received in evidence.  20 C.F.R. § 416.927(c).  The ALJ will consider any statements that have been provided by medical sources, whether or not based on formal medical examinations.  20 C.F.R. § 416.945(a)(3).  Although the ALJ reviews and considers all the evidence before him, the responsibility for assessing the claimant's residual functional capacity rests with the ALJ.  20 C.F.R. § 416.946(c). Here, the ALJ's findings were supported by relevant evidence and consistent with the record as a whole.  The court finds that the ALJ's RFC is based on substantial evidence in the record, as outlined in his findings and supported by medical evidence.

## IX.  SUMMARY

For the foregoing reasons, the court finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, that decision is affirmed.


IT IS SO ORDERED.

Dated:   Sept. 25, 2013         /s/ Kenneth S. McHargh
                                Kenneth S. McHargh
                                United States Magistrate Judge